**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert FONSECA, Defendant-Appellant.**

**No. 73–2875.**

United States Court of Appeals, Fifth Circuit.

March 6, 1974.

Joseph Calamia, John L. Fashing, El Paso, Tex., for defendant-appellant.

William S. Sessions, U. S. Atty., San Antonio, Tex., Edward S. Marquez, Asst. U. S. Atty., El Paso, Tex., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and GEE, Circuit Judges.

AINSWORTH, Circuit Judge:

Robert Fonseca was indicted and convicted on two counts of knowingly and intentionally importing and possessing, with intent to distribute, 50 pounds of marihuana, in violation of 21 U.S.C. §§ 841(a)(1) and 952(a). Fonseca appeals, and we affirm.

On May 9, 1973, Customs Inspector Armijo was on duty in the primary lane at the Cordova Bridge (now known as the Bridge of the Americas) at El Paso, Texas. At approximately 11:15 p. m., Robert Fonseca, appellant, driving a 1966 Chevrolet, approached the bridge

from Juarez, Mexico. As Fonseca drove into the primary lane, Agent Armijo punched the vehicle's license number into a CADPIN (Customs Automated Data Processing Intelligence Network) machine, now known as TECS (Treasury Enforcement Communications System). The machine registered a positive hit.[1] Fonseca was questioned and he said that he was an American and had nothing to declare from Mexico. At this time Agent Armijo looked at the CADPIN machine and it read, "Escort to Secondary. Refer to Secondary." He then immediately directed Fonseca into the secondary lane. A search of the vehicle revealed what appeared to be approximately 42 pounds of marihuana contained in a sack with Mexican markings on it. Customs Inspector Clark, on duty at the secondary lane, reiterated that Fonseca declared nothing. Clark approached the car and asked Fonseca to step out and open the trunk, which he did. Clark looked inside and saw a white bag. Fonseca made no comment when asked about the contents of the bag. Clark instructed him to pull the bag out. As he did one brick of marihuana fell out. Fonseca was subsequently placed under arrest by Customs Agent Henry and advised of his constitutional rights. The vehicle which appellant was driving when arrested had been purchased by his brother, Celso Fonseca, was registered in Celso's name, but was used almost exclusively by appellant and another brother and sister.

Appellant's defense is that he did not know that the marihuana was concealed in his vehicle. He did not testify; however, the assertion of his unawareness of the marihuana was elicited through cross-examination of Customs Agent Henry who questioned Fonseca at the time of his arrest.

Appellant seeks a reversal of his conviction on several grounds. He contends that the trial court erred in:

1. Failing to grant a mistrial and in permitting the prosecutor to show the jury the following:

A. That twice on January 18, 1973, marihuana seeds were found in two different vehicles and at two different times by customs inspectors during border searches at the Mexican border crossing at El Paso when Carlos Jimenez and unnamed individuals were in said vehicles, and Fonseca was not present, notwithstanding that at the end of the trial the trial judge withdrew such evidence from the consideration of the jury.

B. That on April 25, 1973, petulia oil and what appeared to be marihuana seeds and cigarette papers were found in a vehicle by a customs inspector during a border search at the Mexican border crossing at El Paso when Fonseca and Carlos Jimenez were in the vehicle.

2. Failing to sentence Fonseca under the Youth Corrections Act.

3. Giving an "Allen" charge to the jury.

Appellant further contends that:

4. The mere driving by defendant of a vehicle in which marihuana is found is insufficient to authorize a conviction of an accused who denies knowledge of the marihuana.

Defense counsel filed a motion *in limine* requesting, *inter alia*, that the trial court prohibit admission of evidence of three bridge-crossing incidents which occurred prior to May 9, 1973, as well as evidence showing that appellant was involved with any CADPIN machine "hit." The trial judge denied the motion, based on his belief that the series of transactions could have a bearing on the knowledge and intent of defendant. Defense counsel was granted a continuing objec-

---

1. Agent Armijo explained what he meant by a positive hit: "If there is any intelligence on the license number of any vehicle, the machine will register. It goes yes. If it is no, it will just say no. There is no sound. If it is a positive, it makes a noise and goes 'Yes, yes, yes.' It repeats over and over. And there is a telephone that rings, a bell goes off and we know we have some information on this car."

tion and a promise by the court that the jury would be instructed in regard to the limited purpose of the evidence to be received.

*The three bridge-crossings prior to that of May 9, 1973:*

1. Customs Inspector Cox testified that on January 18, 1973 he was on duty when an individual by the name of Carlos Jimenez, then driving a blue 1963 Chevrolet Impala, with Texas License No. CTZ 917, was referred to the secondary lane for inspection. Marihuana residue was found in the automobile. Jimenez was accompanied by a person other than defendant. A report was made of the search.

2. Customs Inspector Stewart testified that on the evening of January 18, 1973 he conducted a search of a green 1963 Chevrolet Biscayne which had been referred to the secondary lane for inspection. The search revealed a few marihuana seeds beneath the back seat and about 100 to 150 marihuana seeds in the trunk. The vehicle was driven by Carlos Jimenez who was accompanied by a passenger other than defendant. A report was also made of this search.

3. Customs Inspector McCarty testified that on April 25, 1973 appellant Fonseca, accompanied by passenger Carlos Jimenez, arrived at the bridge in a blue 1966 Chevrolet Impala, License No. CXW 325, the same car involved in the present case. A substance known as petulia oil (described as cologne with a fragrance similar to that of marihuana) and what appeared to be marihuana seeds and papers used to roll cigarettes were found in the vehicle. Jimenez made a false claim of citizenship and was referred to Immigration authorities. Fonseca denied any knowledge of the marihuana seeds or residue and was allowed to leave. The incidents were reported.

Customs Agent Henry explained the operation of the CADPIN machine. The system is used with computer hook-ups throughout the country, in order to put other customs employees on notice of a suspicious vehicle, aircraft or person who might be carrying contraband. Henry was present in the courtroom during the testimony of Inspectors Cox, Stewart and McCarty. The information they had compiled relating to searches on January 18 and April 25, 1973 had been fed into the computer machine. Under the system, as a vehicle approaches the port of entry, the license number of the vehicle is queried in the TECS system. An inspector types the number into the machine, pushes an access button and asks the machine, "Do you have any information on this particular identifying characteristic?" The machine will respond, "Yes" or "No." If the response is "Yes" it is called a hit. The machine might also alert an inspector by indicating "Armed and Dangerous" if that information had been fed into the computer. If not, it would say, "Escort to Secondary." In this particular case, the machine registered only, "Yes, yes, yes, Escort to Secondary." Another machine is kept at the Head House in the vicinity. It is a hard copy printout that starts printing out the minute the number comes back as a hit. That is given to the inspector for any special instructions he is not aware of at that time. The following information might appear on the printout: the vehicle license and identification number, the description of the vehicle and the names and descriptions of the persons associated with the vehicle; special instructions such as whether to search the individuals, hold them, notify the agents, release them, or arrest them on the spot if they are fugitives. On objection by defense counsel, Agent Henry was not allowed to testify to the particular information which appeared in the printout on May 9, 1973, and said only that he was advised "that they had the marihuana and they gave me the print-out. And I placed the defendant under arrest at that time." Agent Henry further testified that the marihuana which was seized from defendant was worth between $16,000 to $20,000.

Fonseca bases his lack-of-knowledge-and-intent defense on Agent Henry's testimony on cross-examination. This testimony shows that after Henry advised Fonseca of his constitutional rights he asked Fonseca if he wished to explain where he got the marihuana and where he was going to deliver it. Fonseca told him that he had no knowledge of the marihuana, that he had been in Juarez drinking with some friends and that he had lent his car to an individual. Agent Henry did not remember whether Fonseca told him the name of that individual. In response to the question of whether Fonseca had mentioned the name of Raul Valascas or had given a description of Valascas, Henry said that he could not recall. He agreed that it was possible for the narcotics to have been "planted" in Fonseca's car, but conversely was aware that it was common for people arrested at the bridge with a considerable amount of marihuana to claim that they had no knowledge of it. He was asked further, "Well, smugglers don't put it in the trunk like that—that obvious?" and answered, "Yes, sir, they do." He said that while this was not ordinary, in the past he has found as much as 500 pounds of marihuana concealed in a trunk of a vehicle.

Prior to the close of the Government's case, the trial judge reversed his former ruling and instructed the jury not to consider any testimony relative to the first two crossings on January 18 in which Jimenez but not Fonseca was in the car. The evidence relating to the April 25 crossing by Fonseca accompanied by Jimenez was not ordered stricken. Appellant contends that evidence of all three crossings should have been excluded. The trial judge gave the following instructions at this point in regard to these three incidents:

"Members of the jury, I believe the evidence in this case up to this time does show that there was evidence [of] two crossings in which inspections were made of vehicles in this case, one of which Mr. Jimenez was stopped. I believe there is evidence to that effect, and that his car did have some evidence of marihuana seeds or something to that effect. And then the evidence later shows that Mr. Jimenez and the Defendant in this case, Mr. Fonseca, were together when a similar inspection took place and where there were seeds found. And of course this information according to the witnesses went into the CADPIN computer.

"I'm going to instruct you that with reference to the first crossings involving only Jimenez in which Mr. Fonseca was not in the car, that you are not to consider that testimony as any evidence of guilt whatsoever, and you are to totally disregard that particular evidence of that particular incident and that particular search. Anything they found with reference to the automobile which was being driven at the time by Mr. Jimenez that is entirely to be disregarded by you. As far as I'm concerned, it is absolutely no evidence of the guilt of this particular Defendant and it cannot be used by you as any evidence whatsoever.

"Now, with reference to the second crossing in which there is evidence that Mr. Jimenez was in the automobile with Mr. Fonseca, the Defendant in this case, and where there was found evidence in the vehicle of marihuana seeds, and you've heard exactly the testimony, that that testimony and that evidence with reference to that second search in which Mr. Jimenez and Mr. Fonseca were both in the car, it is admitted solely for the purpose of showing, if it does, the knowledge of the Defendant of the marihuana contained in the trunk of the vehicle he was driving on May the 9th, 1973 which was searched at the Port of Entry, and for no other purpose whatsoever."

The trial judge further instructed the jury:

"All right. On April the 25th. Well, with reference to the crossing by Mr. Jimenez in which Mr. Fonseca was not actually a passenger in the car, I'm instructing you, ladies and gentlemen of the jury, that this is not competent evidence for you to consider in this case,

and you are to disregard that evidence for all purposes. With reference to the crossing which Mr. Fonseca and Mr. Jimenez were in the car together, you are at liberty to consider that for the sole purpose of establishing knowledge, if any, beyond a reasonable doubt and no other reason."

■ In response to appellant's contention that the evidence pertaining to the bridge crossings on January 18 should have been excluded (as it was by the district judge in instructions to the jury), the Government contends that it was admissible to show knowledge and a continuous transaction by appellant. We do not agree. The evidence was irrelevant, having no connection with appellant. Moreover, Government counsel informed the jury in his opening statement of his intent to prove knowledge of defendant by the incidents on January 18 and later by introducing that evidence through the testimony of Customs Inspectors Cox and Stewart. Nevertheless, the error was cured by the instructions of the trial judge admonishing the jury to disregard that evidence in its entirety. Unlike the cases relied on by appellant, this is not a case where testimony of prior crimes of the defendant was admitted for improper purposes.[2] Nor is it a case in which the testimony is so highly prejudicial that no instruction could erase the harm done.[3] In essence the jury was informed that Carlos Jimenez, not appellant, was involved in certain questionable conduct related to the transportation of marihuana. It is doubtful that this evidence influenced the jury in its verdict.

The thorough and emphatic instructions of the trial judge effectively removed any prejudice. In view of the curative instructions, and the overwhelming evidence of guilt, the error was harmless.[4]

■■ The April 25 bridge crossing is in a different category, however, and we find no error by the trial court in admitting evidence pertaining thereto. It was appellant this time who drove the vehicle, the same vehicle which was stopped on the day he was arrested. As on the day of his arrest, there was evidence of marihuana in the vehicle: "What appeared to be marihuana seeds and cigarette papers" were found. Admissibility of evidence is a matter within the broad discretion of the trial court, United States v. Abshire, 5 Cir., 1972, 471 F.2d 116; United States v. Gonzalez, 5 Cir., 1972, 466 F.2d 1286. While it is clearly established that such discretion would be abused if evidence of prior crimes or misconduct were permitted for the purpose of showing either the criminal character of a defendant or his propensity to commit crime, if the incident is closely related in time and nature to the crime charged, it is admissible for the purpose of showing intent or knowledge. See United States v. Kasouris, 5 Cir., 1973, 474 F.2d 689; Gilstrap v. United States, 5 Cir., 1968, 389 F.2d 6; and United States v. Dryden, 5 Cir., 1970, 423 F.2d 1175, 1178, where we quoted with approval language from

2. *See* Boyd v. United States, 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077 (1891), a murder trial, at which proof of robberies committed by defendant was held erroneous; Burgett v. State of Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967), in which introduction of a constitutionally infirm prior criminal conviction for the purpose of enhancing punishment was held erroneous.

3. *See* Odom v. United States, 5 Cir., 1967, 377 F.2d 853, which involved testimony by an officer that he had seen the accused come in and out of jail; McMillian v. United States, 5 Cir., 1966, 363 F.2d 165, a liquor laws violation case involving hearsay testimony of a Government agent to the effect that he recognized an automobile in the vicinity of defendant's house to be the same as one described by an informer which had been used in other illicit whiskey operations.

4. The evidence "shrinks into insignificance when compared with the properly admitted" evidence of 50 pounds of marihuana, thus supporting the conclusion that the error was harmless beyond a reasonable doubt. See United States v. Steinkoenig, 5 Cir., 1973, 487 F.2d 225, 230; United States v. Bankston, 5 Cir., 1970, 424 F.2d 714.

the Second Circuit which is pertinent here:

> Where, as here the evidence is susceptible of the interpretation that the acts alleged to constitute the crime were innocently performed and the vital issues of knowledge and intent are keenly disputed, it is well within the trial judge's discretion to permit the Government, on a properly limited basis, to introduce evidence of prior similar offenses demonstrating the unlikelihood that the defendant was a mere innocent, unknowing bystander. For in such cases the jury must be relied upon not to convict the defendant solely because he is an evil fellow with a propensity towards criminal behavior in general * * * but because of the sheer improbability that a person with his familiarity and experience with the specific criminal conduct charged might have been unaware that a crime was being committed or might have performed the acts with an innocent and lawful intent.

United States v. Klein, 2 Cir., 1965, 340 F.2d 547, 549.

Appellant relies on United States v. Broadway, 5 Cir., 1973, 477 F.2d 991, in which we reversed a conviction of a defendant at whose trial the district judge erroneously admitted evidence of other related offenses even though limiting its use for the purpose of showing intent and guilty knowledge. Broadway was charged with transporting and causing to be transported in interstate commerce a falsely made and forged security [Travelers Express Money Order No. 939] in violation of 18 U.S.C. § 2314, under which statute proof of guilty knowledge is requisite for a conviction. Broadway's defense was that he did not know that the money order was stolen or forged. In an attempt to prove guilty knowledge, the Government put in evidence two other money orders, Nos. 864 and 873, from the same series as Money Order No. 939. There was proof that all three money orders had been negotiated at about the same time, all were payable to Broadway, and all bore similar endorsements. The Government also presented proof that Money Order No. 939 had been cashed and caused to be put into interstate commerce by Broadway; however, it failed to present similar proof in regard to Money Orders Nos. 864 and 873. In applying the principle that proof of similar offenses introduced for the purpose of showing intent and guilty knowledge must be "plain, clear and conclusive," 477 F.2d at 995, we found that there was no proof of *similar* offenses, as the requisite element of transporting or causing to be transported in interstate commerce of Money Orders Nos. 864 and 873 was lacking. We held:

> [W]hen proof of an assertedly similar offense is tendered to establish necessary intent, the other offenses proved must include the essential physical elements of the offense charged, and these physical elements, but not the mental ingredients of the offenses must be clearly shown by competent evidence.

477 F.2d at 995.

■ Here the charges on which Fonseca was found guilty contained the physical elements of importation and possession.[5] The assertedly similar conduct tendered to establish intent or knowledge also contains the physical elements of importation and possession. In each instance, on April 25 and on May 9, Fonseca was in the act of possessing and importing marihuana when he was stopped at the bridge.

In *Broadway*, however, the physical elements to be proved were: (1) transporting or causing to be transported in

---

5. The elements of knowledge and intent present in the indictment against the defendant are subjective or mental and do not require direct proof. "Knowledge, intent and the like are typical mental elements. These may be inferred by the trier of fact, from the totality of the circumstances, in the same manner in which the trier of fact is entitled to infer such elements in determining guilt or innocence of the offense on trial." United States v. Broadway, 5 Cir., 1973, 477 F.2d 991, 995 n. 5.

interstate commerce (2) a falsely made (3) and forged security. The asserted "similar" offense lacked proof of one of the elements—the transportation element. *Broadway* merely emphasizes the principles to which we have always adhered, that in order to prove intent or guilty knowledge other offenses offered in evidence for that purpose must be similar.[6] And *Broadway*, of course, is based on its own peculiar facts.

■ There was no error in the trial court's failure to find explicitly, before sentencing Fonseca (then 19 years old) as an adult, that he would not benefit from the rehabilitative treatment of the Youth Corrections Act, 18 U.S.C. § 5005 et seq.[7] The transcript of the sentencing proceedings shows that the trial judge commented extensively on his reasons for not sentencing Fonseca under that Act.[8] Whether the trial judge must make such findings is an open question.[9] We pretermit the issue here inasmuch as the court's comments were tantamount to a finding that Fonseca would not benefit from a sentence imposed under the Youth Corrections Act.

■ There likewise was no error in the so-called "Allen" charge given by the district court.[10] In United States v. Bailey, 5 Cir., 1973, 480 F.2d 518, this Court, en banc, approved the Allen charge within the limitations delineated in the panel opinion, United States v. Bailey, 5 Cir., 1972, 468 F.2d 652. The supplemental jury charge given here is well within the confines of *Bailey*.

---

**6.** *See, e. g.*, United States v. Sanchez, 5 Cir., 1973, 482 F.2d 5, 8: "We are not persuaded that the charge against appellant of assault on a bartender is evidence of an intent to forcibly assault, resist, oppose, impede and interfere with a federal officer, . . . ."; and United States v. Jaqua, 5 Cir., 1973, 485 F.2d 193, 195: "There is no similarity or discernible pattern between the transactions inquired into [alleged striking of a lady and destruction of property] and the offense charged [assault of a federal officer], . . . ."

**7.** 18 U.S.C. § 5010(d) reads as follows:
"If the court shall find that the youth offender will not derive benefit from treatment under subsection (b) or (c), then the court may sentence the youth offender under any other applicable penalty provision."

**8.** In imposing sentence the trial judge said: "I did consider Youth Correction in this case but based upon the evidence in the case and the information contained in the presentence report, he has had associations that suggests to me a possible prior involvement with marihuana. Sweepings and residue in the car with people he was associated with, one of which is at large which would indicate that he has been connected with the marihuana traffic. Furthermore, he was given the benefit of a bond and while on bond he violated it."

. . . . .

"This was a case where possession, constructive possession at least of this defendant was pretty well assured by the fact that the 50 pounds of marihuana was found in the car which this particular defendant was driving. I am very well aware of the defense he has asserted, but I'm also alive to the suspicious circumstances that surrounded his arrest after he had been given the benefit of bail and before it had been revoked for that reason by Judge Guinn."

. . . . .

"I want you to know that I considered very carefully Youth Correction both (a) and (b). Under these circumstances, I just cannot bring myself to do it, Mr. Calamia. And I have considered it very carefully."

. . . . .

"Well, I think I've given you those reasons. I have carefully considered Youth Corrections both (a) and (b). And I have given you the reasons why I have denied it."

. . . . .

"Well, I have considered it and I have given you the reasons why I feel like it would not be appropriate in this case."

. . . . .

"I don't say that it isn't appropriate in some narcotic cases or where convictions are involved, convictions of this type of controlled substance of narcotic drugs. But this is one I just don't feel like is the proper case for the reasons I have given you."

**9.** United States v. Dover, 5 Cir., 1974, 489 F.2d 688. *Cf.* United States v. Schenker, 5 Cir., 1973, 486 F.2d 318. *See also* United States v. Bamberger, 3 Cir., 1972, 456 F.2d 1119; United States v. Jarratt, 9 Cir., 1973, 471 F.2d 226; Cox v. United States, 4 Cir., 1973, 473 F.2d 334; United States v. Dorszynski, 7 Cir., 1973, 484 F.2d 849, cert. granted, 414 U.S. 1091, 94 S.Ct. 721, 38 L.Ed.2d 548; *contra*, United States v. Coefield, en banc 1973, 155 U.S.App.D.C. 205, 476 F.2d 1152.

**10.** Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

There is no merit to appellant's final contention that the mere driving of a vehicle in which marihuana was found is insufficient for conviction under the evidence here. The evidence of guilt was obvious and overwhelming. Fonseca was caught red-handed, crossing from Mexico to the United States, with 50 pounds of marihuana worth between $16,000 to $20,000 concealed in a vehicle driven by him and carrying no other passenger. Appellant offered no direct evidence to substantiate his theory of innocence. Counsel's attempt to establish this defense by eliciting from Agent Henry appellant's disavowal of knowledge, obviously had no more effect on the jury than it had on Agent Henry in his encounter with appellant. Viewing the evidence in the light most favorable to the Government, we are convinced that it was sufficient to support the verdict. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1940).

Affirmed.